UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Docket No. 6:10-cr-73

. . . . . . . . . . . . . . .
UNITED STATES OF AMERICA    :
                           :                Orlando, Florida
           Plaintiff       :                November 18, 2010
                           :                1:30 p.m.
              v.           :
                           :
ERIC ALBERT SEIDEN         :
                           :
           Defendant       :
. . . . . . . . . . . . . . .


           TRANSCRIPT OF SENTENCING
    BEFORE THE HONORABLE ANNE C. CONWAY
         UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiff:  Carlos Perez


For the Defendant:  Mark Seiden


Court Reporter:        Sandra K. Tremel, RMR/CRR
                       407-245-3110


Proceedings recorded by mechanical stenography, transcript

produced by computer-aided transcription.

P R O C E E D I N G S

THE COURT:  Case number 10-cr-73, United States v. Eric Albert Seiden.  Could we have appearances, please.

MR. PEREZ:  Carlos Perez for the United States.  To my left is task force agent Michael Spadafora with the Brevard County Sheriff's Office.

MR. SEIDEN:  Good afternoon, Your Honor.  Mark Seiden.  I represent Eric Seiden.  To my right is Robert Leventhal who is co-counsel on the case.

THE COURT:  Good afternoon.

Would you come forward, please.

MR. SEIDEN:  Your Honor, do you want the defendant up with me?

THE COURT:  Yes.

MR. SEIDEN:  I'm sorry.  I didn't mean to interrupt the Court.

THE COURT:  Good afternoon, Mr. Seiden.

MR. SEIDEN:  Good afternoon, Your Honor.

THE COURT:  I was speaking to Eric Seiden, but --

On August 18, 2010, you entered a plea of guilty to count three of the indictment charging you with use of the Internet, a facility of interstate commerce, to entice a minor, who had not yet attained the age of 18, to engage in sexual activity in violation of Title 18, United States Code, Sections 2422(b).

1    Initially I want to address the in camera filing.  I

2  have reviewed it and most of the materials are not proper

3  for in camera filing.  So I'm going to return this to you.

4  The reports, to the extent that they're contained in the

5  presentence report, do not need to be refiled.  Anything

6  else you want refiled -- of course the victim's name needs

7  to be redacted, but other than redaction, these are the

8  type of materials that are routinely filed in this type of

9  case.

10       MR. SEIDEN:  Does that include the psychological

11  report?

12       THE COURT:  Usually -- they're usually filed in

13  the public record, yes.

14       MR. SEIDEN:  Very well.  I'll refile them.

15       THE COURT:  You can file what you like, what you

16  don't like.  I think the -- isn't the psychological report

17  in the presentence report?

18       MR. SEIDEN:  No, it is not, Your Honor.

19       THE COURT:  Okay.  Well, to the extent that you

20  have things in the presentence report, they don't need to

21  be filed.  I'll leave that up to you whether you want to

22  file it or not.

23       MR. SEIDEN:  Yes.

24       THE COURT:  I reviewed everything that's -- I read

25  the file, but I don't think it's appropriate to be under

1  seal.

2          MR. SEIDEN:  Yes, Your Honor.

3          THE COURT:  The redaction issues.

4          MR. SEIDEN:  I do have witnesses that I'd like to

5  call before the Court imposes a sentence.

6          THE COURT:  All right.  We will get to that.

7     Eric Seiden, have you had an opportunity to read and

8  discuss the presentence report with your attorney?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  All right.  Do you have any objections

11 you wish to be heard on, counsel?

12         THE DEFENDANT:  No, Your Honor.

13         THE COURT:  Counsel?

14         MR. SEIDEN:  Your Honor, all I have is that he did

15 make a statement of acceptance of responsibility which is

16 in my presentence memorandum.  It was forwarded to

17 probation.  It's not appended to the report.

18         THE COURT:  Okay.  I thought it was in the report.

19         MR. SEIDEN:  Not in the copy I have.

20         THE COURT:  Yes.  You sent it to Mr. Salce.

21         MR. SEIDEN:  Yes.

22         THE COURT:  It's in the presentence report.

23         MR. SEIDEN:  Very well, Your Honor.

24         THE COURT:  Along with a copy of the polygraph

25 report.  Those are the two things that are not filed.

 1          Are there any objections by the government?

 2               MR. PEREZ:  No, Your Honor.  No objections.

 3               THE COURT:  There being no objections to the

 4     factual statements contained in the presentence report, the

 5     Court adopts those statements as its finding of facts and

 6     determines that the advisory guidelines are a total offense

 7     level 31, criminal history category I, 120 to 135 months

 8     imprisonment, five years to life for supervised release,

 9     41,600 restitution, 15,000 to 150,000 fine, $100 special

10     assessment.

11          Is the victim present in the courtroom?

12               MR. PEREZ:  The victim is not, but the stepfather

13     and the biological mother are present in the court.

14               THE COURT:  Do they wish to make a statement?

15               MR. PEREZ:  The victim's stepfather will make a

16     statement.

17               THE COURT:  Okay.  Go ahead.  We will do that now.

18               MR. PEREZ:  Your Honor, he has a witness statement

19     that he will read to the Court.

20               THE COURT:  Okay.

21               THE STEPFATHER:  The best I can.  First of all,

22     thank you for letting me be here today and express a little

23     bit of what my family -- has taken place in my family since

24     this happened.

25          I came here today on behalf of my son and my family to

speak about all the -- how this has affected our lives and
the irreversible damage that it has caused.

My son has grown up in a Christian house.  We teach
things like respect, respect for adults, trust and love.
These very things that have been taken from him by
Mr. Seiden.

My son has a hard time trusting people any more.  He
has -- he does not know what is real and who is real and
who is not.  He's filled with anger and uncertainty, and
these things are noticeable changes in how he interacts
with other adults.

My son now lives in a world of nightmares, anger,
solitude and fright.  My wife and I are finding ourselves
waiting at the bottom of stairs at night before we are
ready to go to bed as my son walks the house twice making
sure all the windows and doors are locked.  His world has
been forever changed.  Our psychologist says there's no way
we could ever erase the damage that's been done but only
how to cope with it.

Once again, one man looking for a thrill has destroyed
a child's life and stole his freedom.

This has not only been an emotional roller coaster for
my son but also for my family.  This is not only the
emotional roller coaster for my son but also for my family.
Likewise, we as parents have to cope with this and move

forward and sometimes that means allowing him to go places
with his friends and trust that he will return safely.
This does not -- this does not go without checking calls to
my wife in a constant worry until he returns.

I can go on, but in closing I sit back and I think
about it and I think about a 10 year sentence.  I think to
myself, what a deal.  Mr. Seiden gets ten years and my son
get's life.

Your Honor, today I ask to you send a clear message
that a 10 year sentence on the table as a penalty for such
a crime is more.  I ask you to send a message these crimes
will not be tolerated and other children will not face what
my son has faced and have to go through the heartache my
family has gone through and will continue to go through.
Majority of my son's life is that it will always be there.
It will always be there.  And after going through this
process, I see how many people are out there doing this,
and there's got to be way to stop it.  And I honestly think
if a sentence is long enough, these people will think about
it.  And ask you for that.  Ask to you send a message today
on behalf of my son, a 15-year-old boy at the time, taken
advantage of and how this is going to affect our lives and
his life forever.

I thank you very much.  Thank you.

THE COURT:  Counsel, do you know of any reason why

1  the Court should not proceed with the imposition of

2  sentence?

3  　　　　MR. SEIDEN:  Your Honor, we do have witnesses we'd

4  like to call.

5  　　　　THE COURT:  All right.

6  　　　　MR. SEIDEN:  Before the Court does that.

7  　　　　THE COURT:  All right.  Go ahead.

8  　　　　MR. SEIDEN:  Thank you.  Your Honor, I would first

9  call Ronald Seiden who is Eric's father.

10  　　　　　　　　　　**(WITNESS SWORN)**

11  BY MR. SEIDEN:

12  Q　　Sir, would you please state your name.

13  A　　Ronald Seiden.

14  Q　　And how old are you?

15  A　　77.

16  Q　　And where do you live?

17  A　　Deering Bay in Coral Gable, Florida.

18  Q　　And what is your occupation?

19  A　　I am a businessman.

20  Q　　What's the name of the company?

21  A　　Interstate Screw Company.

22  Q　　Is that your company?

23  A　　Yes.

24  Q　　And how old is the company?

25  A　　56 years.

1   Q    Are you presently suffering from illness?

2   A    Well, lung cancer.

3   Q    And you are -- and what position did Eric have in

4 terms of family to you, what relation was he?

5   A    My son.  And when I got lung cancer I kind of

6 semi-retired and Eric became CEO.

7   Q    And how long has he been with the company?

8   A    20 years.

9   Q    When Eric was growing up, were you a warm and loving

10 father or a cold and distant one?

11   A    Well, in reflection, I was probably a little cold and

12 distant.

13   Q    And was there a time when you and Eric's mother got

14 divorced?

15   A    Yes.

16   Q    How old was Eric at the time?

17   A    About five years old.

18   Q    What sort of a boy was he as a young boy?

19   A    Very nice, shy, into books.

20   Q    And when you became ill and Eric returned from his

21 education to help run the business, how many years ago was

22 that approximately?

23   A    15.

24   Q    And has he --

25   A    That was my heart bypass.

Q    That was your heart bypass, okay.  What were -- the
time that he's been with the company he's been back in
Florida, except for the instant case, has there been any
evidence whatsoever that you're aware of of any aberrant
behavior in his life?

A    No.  He's been a hardworking fellow that gives to
charity, cares about his employees.  He has no priors.

There was an ad or an article in the paper all over the
state of Florida about Eric being arrested and they assumed
eight or 10 more victims would appear and none did.  So I
guess the clean record except for this one, one unfortunate
case.

Q    Is there anything you care to say to the judge before
she imposes sentence?

A    Well, because of this being the first instance and his
clean record, and that he's a credit to society, he's not a
threat or anything or to leave -- I would really hope that
the sentence is minimum so he can get back to a life.  I'm
sure he's learned his lesson.  And I beg the judge to be
lenient in this instance.

Q    Thank you, sir.

MR. SEIDEN:  Counsel, do you have -- you may
inquire.

MR. PEREZ:  No questions, Your Honor.

THE COURT:  All right.  You may be excused.

1    MR. SEIDEN:  The next witness I would call would

2  be Greg Mann.

3                **(WITNESS SWORN)**

4  BY MR. SEIDEN:

5  Q    Sir, would you please state your name and spell your

6  last name.

7  A    My name is Gregory Mann, M-A-N-N.

8  Q    And how old are you?

9  A    I'm 42.

10  Q    And where do you live?

11  A    I live in Parkland, Florida.

12  Q    And are you single or married?

13  A    I am married.

14  Q    Do you have any children?

15  A    I have two boys, 12 and 10.

16  Q    And what is your educational background?

17  A    I have a B.A. CCY from George Washington University

18  that's Bachelor of Accountancy.  I also have a J.D., a Juris

19  Doctorate from Emory Law School.

20  Q    And what is your present occupation?

21  A    I am president of All Points Screw Bolt Specialty, a

22  company that I previously owned and sold at the end of 2007.

23  Q    Is that the same sort of company as Interstate Screw

24  where Eric worked prior to his incarceration?

25  A    Yes.  It's the same industry.

1   Q    And how did you meet Eric?

2   A    When we -- when my wife and I originally acquired All

3   Points back in 1996, after meeting the customers at the

4   company had -- one of my priorities was meeting the

5   competitors.  There's always some competitors you can be

6   friendly with, trade off product, do business.  Then there

7   are other ones that you just compete against.  I met Eric

8   really at the instance of one of our mutual vendors that

9   thought he and I both had some of the same qualities and he

10  thought we would get along really well.

11  Q    And would it be fair to characterize your relationship

12  as friendly competitors?

13  A    Absolutely.  We started out trading some product,

14  placing orders with each other and as you get on the phone

15  you start talking with each other, you realize you have some

16  common interest.  We both like the same type of music, we're

17  both hockey people.  So we started attending some concerts

18  together and friendship kind of grew out of that.

19  Q    And did you also attend trade shows together?

20  A    We did.  We traveled to Las Vegas together and several

21  different industry type events.

22  Q    Would you ever go to the Far East?  In other words,

23  China or Taiwan, countries such as that in order to go to

24  factories where your products are made?

25  A    One of the things that Eric and I did was we started a

teaching or introducing ourselves to our vendors overseas,
and we started doing that in trade shows.  It became pretty
apparent that we would be better off doing some joint
buying.  We would be able to save on container shipping
cost.  We did make two joint trips to Taiwan and China.

Q     During those trips, did the factories or the factory
representatives where you were going to exam products for
purchase have occasion to offer you sexual favors from men,
women, boys and girls?

A     Unfortunately it's common practice over there.
Vendors always want to take us for massages, bellhops at
hotels ask us if we wanted men, boys, girls.  Every time
that we were offered that both Eric and I were appalled and
pass on every opportunity and did everything we could to
avoid situations where we would even be asked.

Q     Eric was appalled at that as well?

A     Absolutely.

Q     Were all such invitations declined by both you and
Eric?

A     Every invitation was declined.

Q     Are you familiar with Eric's reputation in the
business community for integrity and ethics?

A     Yes.

Q     What is that reputation?

A     Eric has an excellent reputation.  Eric's -- most of

Eric's customers do not buy from Interstate Screw.  They buy
from Eric, which is basically the highest compliment a
customer can give you.  Vendors would line up and sell them.
Vendors knew that when Eric carried their product line, he
was going to distribute the product with integrity; he was
going do it the right way.  He was always going to do the
right thing by the vendor.  I would routinely get vendors
asking if I could put a good word to Eric for them, how do I
get them past the receptionist to his front door, which was
his office, I should say.

Q    Earlier you said you were married with two boys.

A    Uh-huh.

Q    Now, as you sit here today, know that Eric has pled
guilty to a serious crime involving an underaged boy, based
on your knowledge of him as you sit here today, if he were
not in custody, would you have any hesitation about him
interacting or being with your two sons?

A    Absolutely no hesitation leaving Matthew and Daniel
with Eric being unsupervised.  He's been with them several
times.  I would have absolutely no reservations about doing
that.

Q    Is there a recommendation that you would care to make
to the Court as to what you believe an appropriate sentence
might be based upon your knowledge of Eric?

A    Your Honor, I realize that what Eric did was terrible,

terrible thing, that notwithstanding, knowing Eric as I do

for the past 14 years, knowing how he is in society, knowing

how he acts, I beg you to be as lenient as possible.  I do

not believe Eric will be a danger to society.

        MR. SEIDEN:  Thank you, sir.

   Counselor?

        MR. PEREZ:  No questions, Your Honor.

        THE COURT:  All right.  You may be excused.

        THE WITNESS:  Thank you, Your Honor.

        MR. SEIDEN:  Next, I would call Evan Berner.

           **(WITNESS SWORN)**

BY MR. SEIDEN:

Q    Sir, would you please state your name and spell your

last name for the court reporter.

A    Sure.  Evan Berner.  B-E-R-N-E-R.

Q    And how old are you?

A    I'm 40 years old.

Q    And where do you live?

A    I live in Boca Raton, Florida.

Q    Are you married or single?

A    I'm married.

Q    Do you have any children?

A    Yes, I have two children, ages 6 and 8.

Q    And what is your profession?

A    I'm executive vice president of BarCharts Inc.  We're

1  a publishing company in Boca Raton.

2  Q    What sort of product do you publish?

3  A    We publish laminated reference guides, study guides

4  for, you know, school, law school, undergraduate, and things

5  of that nature.

6  Q    How long have you known Eric?

7  A    I have known Eric since about 1997.  So 13 years now.

8  Q    And did you share any particular sporting interest

9  together?

10  A    Yeah.  We're both huge hockey fans.

11  Q    Florida Panthers?

12  A    Yes.

13  Q    And after you met did you have occasion to develop a

14  friendship?

15  A    Yes.  We would, you know, meet for dinners, go out,

16  see movies, ice skating, things of that nature.

17  Q    Both together and with groups of other friends?

18  A    Yes.

19  Q    And how often would you estimate that you saw Eric?

20  A    I would say usually once a week, once every other week

21  planning schedule.

22  Q    Did Eric have occasion to interact with your family,

23  your wife and your children?

24  A    Yes.

25  Q    Did he ever do or say anything that was in the least

1 bit improper?

2 A     No, not at all.

3 Q     Now you have two children.  Are they boys or girls?

4 A     I have an eight-year-old boy and six-year-old girl.

5 Q     And even now as Eric stands convicted of this very

6 serious crime, would you have any hesitation to leave your

7 children with him?

8 A     No.  Both my wife and I feel extremely comfortable

9 with him with our children.

10 Q     Even after he pled guilty to this?

11 A     After he pled guilty.

12 Q     In the 13 years that you have known him, have you ever

13 had the slightest inkling other than the instant case that

14 we're here on today that he has ever violated any laws or

15 done anything improper or illegal?

16 A     No, not at all.

17 Q     Do you have a sentencing recommendation that you would

18 care to give to the Court?

19 A     Well, aside from leaving out of here a free man, I

20 would definitely recommend the minimum sentence.

21 Q     Why?

22 A     Well, based on his standing in the community, his

23 business standing, and just the fact that he's been a good

24 person all his life and made one bad mistake.

25         MR. SEIDEN:  Thanks.

1      Counselor?

2              MR. PEREZ:  No questions, Your Honor.

3              THE COURT:  All right.  You may be excused.

4              MR. SEIDEN:  Your Honor, at this point I'll call

5   Karen Tuvia.

6                        **(WITNESS SWORN)**

7   BY MR. SEIDEN:

8   Q    Ma'am, will you please state your name and spell your

9   last name for the record.

10  A    Karen Lynn Tuvia.  T-U-V-I-A.

11  Q    And how old are you?

12  A    50.

13  Q    Where do you live?

14  A    Bay Harbor Island, Florida.

15  Q    What is your occupation?

16  A    I own a travel agency.

17  Q    And what is your marital status?

18  A    I'm a widow.

19  Q    How did you happen to meet -- first of all, do you

20  know Eric?

21  A    Very well.  I have known Eric for over 15 years.

22  Q    And how did you happen to meet him?

23  A    I met Eric, I guess, through skating with my son.  We

24  would skate every Saturday, every Sunday.  We'd sit next to

25  him at hockey games.  We became quite friendly.  I was going

through a very hard time with -- my husband was terminally
ill and was very, very ill for about 15 years before he
passed.  Eric was the one that was always there for me.  He
kept me going, made me strong.  Helped my son and myself so
much so that my son is here today also to support him, and
my son's now 21.  You know it was a very, very, very hard
time and Eric is the type of person that gives from his
heart.  He's -- he's just very caring, very loving, very
always there for you, very honest, very decent.  And he made
a mistake.

Q    Did you and Eric ever have a romantic relationship of
any sort?

A    No.  Just very, very dear friends.

Q    Did you ever travel together?

A    We've been to London a few times.  We spent the
last -- actually before this one, the last two Christmases
and New Years together in London.  I went to Vegas a few
times.  Have the same interests, you know, like the same
museums and just to always, you know, gone away together and
have fun.

Q    When you would go to London or Las Vegas, would you
stay together or stay separately?

A    No, separate rooms.

Q    And when you would have group activities with friends,
who was the one that organized them?

A    Only Eric.  Eric would -- Eric's the type of person --
right after my husband died I just, you know, kind of shut
down, didn't want to go out so much, but Eric was the one,
he always e-mailed everyone.  He contacts everyone, tries to
get us all to get together, whether it's a movie, dinner,
hockey game, theater.  He's like -- he was like the group
leader.  I mean, he always made everybody get together and
feel comfortable.

Q    In all the time that you've known him, has he ever
done or said or acted in any way that was improper either
sexually or otherwise?

A    Never.  Never.  Not to my son, not to anyone.  We have
traveled.  We have been all over.  We've been together for
over 15 years as close friends.  Never.

Q    Is there a sentencing recommendation that you would
care to make to the Court?

A    I would request that you be as lenient as possible.
This is a man who's always helped the community whether it
was with Katrina and he would set up a four to one matching
with his employee, he donated to --

Q    What was a four to one matching for --

A    For Katrina, for Haiti, for whenever there was any
kind of anything going on, he -- whoever donated, he would
match four to one.  He donated to Doctors Without Borders,
Red Cross.  He was also involved -- he was one that sent

1  e-mail to get everybody involved.  He's always been a very

2  active member of society.  And he's always been very helpful

3  to anyone -- anyone who needed help.

4      This was a mistake.  I would beg you to please be as

5  lenient as you can.  This was a one time -- you can go back

6  and you can check.  Nobody has ever found anything.  It has

7  never happened and it will not happen.  I believe that with

8  my heart as does my son.  I would request that you be as

9  lenient as possible.

10          MR. SEIDEN:  Thank you.

11      Counsel?

12          MR. PEREZ:  No questions, Your Honor.

13          THE COURT:  You may be excused.

14          MR. SEIDEN:  Your Honor, at this time we would

15   call our last witness, which is Dr. Merry Sue Haber.

16                    **(WITNESS SWORN)**

17  BY MR. SEIDEN:

18  Q    Would you please tell us your name and spell your last

19  name for the record.

20  A    Merry Sue Haber, H-A-B-E-R.

21  Q    How do you spell your first name?

22  A    M-E-R-R-Y.

23  Q    And what is your profession?

24  A    I'm a clinical and forensic psychologist.  I have been

25  in practice since 1966 licensed in the State of Florida.

1  Q    And what degrees do you hold?

2  A    I have a BA degree in philosophy and psychology and a

3  Ph.D. degree in clinical psychology.

4  Q    And can you inform the Court as to your professional

5  background in terms of both clinical counseling and

6  evaluations?

7  A    Over the last 45 years I've maintained a small

8  clinical counseling practice.  Mostly what I do are

9  evaluations for courts and for private lawyers, for

10 prosecutors.  I've conducted approximately 450 evaluations a

11 year for the last 25 years.  And I do some treatment for

12 those people that I evaluate as ordered by the Court.

13 Q    Approximately how many times have you testified as an

14 expert witness in your field in a court of law?

15      MR. PEREZ:  Your Honor, if I may, the government

16  stipulates to the doctor's qualifications.

17      THE COURT:  All right.

18      MR. SEIDEN:  Thank you, counselor.

19 BY MR. SEIDEN:

20 Q    Have you been trained in evaluating sexual offenders?

21 A    Yes, I have.

22 Q    And were you retained to conduct an evaluation of Eric

23 Seiden?

24 A    Yes, I was.

25 Q    When was that evaluation conducted?

A    I conducted the evaluation on September 23rd and
September 24th of this year while he was incarcerated in the
facility at Sanford, Florida.  I saw him for approximately
eight hours during which time I administered mental status
examinations, clinical interview, and three personality
tests, objectively scored personality tests.  The Minnesota
Multiphasic Personality Inventory-2 restructured form, the
Millon Clinical Multiaxial Inventory-III for Correctional
Inmates, and the Personality Assessment Inventory for
correctional inmates.

    In addition to that, I administered the multi-sex
inventory II which is an objectively scored assessment of
sexual problems.

Q    Can you please inform the Court what you found both in
terms of your testing and your evaluations?

A    I neglected to mention that I administered two risk
assessments for risk of recidivism.

    Essentially what I found was that Mr. Seiden was a
hardworking individual for many, many years who had no
problems with the law, who lived a responsible life and who
was very loyal to friends that he met, some from high school
and has maintained long term relationships.

    He had some social problems in that he was shy and
awkward, which I would relate to his early experience of his
parents' divorce which was very bitter, and he didn't see

his father for the first two years after the divorce.

When his mother remarried when he was in seventh grade, she married an abusive man and eventually discovered that he had beaten in addition to his own son daily, he had beaten Eric, and Eric once witnessed an incident where he, the husband, threw his mother over the couch. He went to defend his mother and was brutally beaten. Shortly after that, she left him.

He suffered because of that. He suffered by being an awkward teenager who was not particularly involved in sports, although he tried. His main interests was in writing and self-expression. And he had a childhood dream of attending Berkeley, University of California, at Berkeley, which he did for two years. But when his father became ill, left Berkeley and returned home to help his father in the business, which he has stayed in since that time.

There were no indications in his test results of any sexual paraphilia. There were no indications of cruelty to animals or unusual symptoms. The results of my two risk evaluations indicate that he is an extremely low risk to recidivate. Nobody poses no risk to recidivate, but I gave him two different measures, one an actuarial measure and the other a clinical measure.

On both of these he scored rather low. Quite low. He

scored zero on the clinical measure and a score of 2 on the actuarial measure, indicating a very low risk to recidivate.

He took all my tests honestly. They all have built-in lie scores and validity scores. Every single test turned out valid with no lying indicated, no deception. He admitted his terrible behavior. He admitted feeling quite guilty and so sorry for his victim.

He passed a lie detector test. I was able to review a lie detector test conducted by Dr. Bierman who does most of the lie detectors for the state attorney's office in Miami. The one question on the test was, "Have you ever had sex with a minor prior to this time?" He passed. Indicating that he never had.

Q    Thank you, doctor.

Do you believe that Eric went into this awful relationship with deliberate intent to seduce a 15-year-old boy?

A    No, I do not.

Q    Can you tell us why?

A    The contact was initiated by the young man over the Internet. This relationship evolved. It is not as though he sought out a young man or he went into chat rooms or the types of things that pedophiles do. This was a relationship that evolved over time and reflected an aberrant episode in the life of a man who previously had lived a good life.

1  Q    And last, do you have an opinion of a reasonable

2  degree of psychological certainty as to whether Eric is

3  likely to reoffend?

4  A    In my opinion his likelihood to re-- to recidivate is

5  minimal.  He presents an extremely low risk.  He's amenable

6  to treatment.  He's eager for treatment.  Treatment works.

7  The program in the prison system is effective.  And I

8  believe his risk is minimum.

9         MR. SEIDEN:  Thank you, Dr. Haber.

10      Counselor.

11                    CROSS-EXAMINATION

12  BY MR. PEREZ:

13  Q    Good afternoon, doctor.

14  A    Good morning -- afternoon.

15  Q    Afternoon.  Yes.  Still.

16       Doctor, did I hear you say that you do 450 evaluations

17  a year?

18  A    About.  I did.  Yeah.  That's a lot.

19  Q    Yes.  Usually how long is an evaluation?

20  A    Well, most of the evaluations are rather short, and

21  there for the court for competency and sanity.  So those are

22  relatively short evaluations.  They take approximately an

23  hour.

24      These type of evaluations are much more extensive, and

25  of this type of evaluation I would say I do about 40 a year.

Q    Now, you said that based on your evaluation of Eric
Seiden that you were not able to determine or ascertain any
type of sexual paraphilia, correct?

A    Any paraphilia, that's correct.

Q    Okay.  Now, can you tell me the definition of a
pedophile?

A    A pedophile is an individual who has a sexual interest
in children generally under the age of 13 without secondary
sexual characteristics.

Q    And the fact that a person engages in this type of
conduct with a minor, would that be an indicator of that
individual is a pedophile?

A    Not necessarily.  In this case, the -- the minor was
15, and had secondary sexual characteristics.  There's a
difference based on the age and the characteristics of --
physical characteristics of the individual, the victim.

Q    Why do you say that?  Please explain.

A    Well, it's -- our Bible is the Diagnostic and
Statistical Manual of Mental Disorders.

Q    The DSM-IV?

A    DSM-IV TR.

Q    Okay.

A    And I did take the liberty of bringing that with me.
It says specifically that in pedophilia you must have a
period of at least six months of recurring intense sexual

1  arousing fantasy urges or behaviors involving sexual

2  activity with a prepubescent child or children.

3       In this case, it doesn't mean that he's not a child

4  molester.  He is a child molester.  But he's not a

5  pedophile.  And the single biggest risk factor for

6  recidivism is being a pedophile.

7  Q    How about being a child molester?

8  A    Not necessarily, because the child molester is related

9  to the age set by the law.  The pedophile is related to the

10 age set by genetics by the DSM-IV recognizing that these

11 people have a truly deviant interest in young children.  And

12 I've seen -- I've probably done about 50 evaluations of

13 people that I would say are serious pedophiles, and --

14 Q    Doctor, let me ask you a question.  Do you think that

15 having a sexual encounter with a 15 year old is appropriate?

16 A    No.  I do not.

17 Q    Thank you.

18      MR. SEIDEN:  I have no further questions of this

19 witness, Your Honor.

20      THE COURT:  Thank you.

21      MR. SEIDEN:  Your Honor, prior to the Court

22 imposing sentence, Eric Seiden would like to address the

23 Court and I would like to address a few brief remarks to

24 the Court as well.

25      THE COURT:  All right.  Go ahead.

THE DEFENDANT:  Your Honor, the victim was only 15 years old.  Maybe he didn't know better, but I should have. I hope and pray that the damage I did to his life can be repaired.  I accept full personal responsibility for my actions.  I expect to be punished for my actions.  I deserve to be punished for my actions.  Nothing I do or say can make up for what I did but I want everyone in this courtroom to know this lesson has been learned and it will never happen again.

Thank you.

THE COURT:  All right.  Counsel?

MR. SEIDEN:  Thank you, Your Honor.

Your Honor, this is a tragic situation for all concerned.  This was a life-altering experience for the young -- for the boy and a life-altering experience for the defendant.  There is no justification for what happened. Absolutely none.  This was a terrible lapse of judgment, but it was a terrible lapse of judgment in a person that has led an otherwise exemplary life.

There has been no allegations that this has ever happened before.  It was in the newspapers.  It was publicized.  No one else has come forward to say anything. I don't believe that the government has any belief that he's ever done this before either.

And as Dr. Haber said, the first contact on the

Internet was made by the victim in the case.  And I say
that not to place any blame on the victim because the
victim is blameless, it's Eric who is at fault in this
case, but the reason that I say that is to show that he was
not himself seeking out underaged people on the Internet
for the purpose of sexually seducing them.

Initially there was no mention of age.  As the e-mails
continued, it became obvious that the boy was underage and
Eric should have immediately stopped contact, but did not,
much to everyone's regret.

There's no suggestion that he ever did anything like
that before.  He passed a polygraph.  He's taken the
psychological test Dr. Haber testified about with no
indication of deception on the built-in portions of the
test that are designed to detect deception.

Magistrate Brown, Stephen Brown in Miami made his first
appearance and then there was a pretrial detention hearing
found on page 20 and 21 of the transcript which I submitted
to the Court which is mentioned in my sentencing memo, that
this was, in his opinion, a one-time incident in Eric
Seiden's life.  And I concur, it's a single aberration in
an otherwise spotless life.

Ten years in prison is a very serious punishment.  I
think if we all look back on our lives as to where we are
now and where we were 10 years ago, we can see that 10

years is a very long time.  And the conviction will have an impact on Eric for the rest of his life.  Even when he's out of prison he will still suffer from the consequences of his actions and still be punished for his actions by the laws that we all live or supposed to live under.

I think back 10 years, 9/11 seems like a very a long time ago to me, but it hasn't been 10 years.  Katrina seems like a long time ago, but hasn't been 10 years.  Ten years is a long time.

I don't think it's an inappropriate time, length of time for a sentence.  I'm not trying to tell the Court -- I'm not going to stand up here before Your Honor and tell you that there should be anything less than the 10 year sentence in this case.  The guideline recommendation in the PSI is 10 years.  It's actually a bit below ten years: 108 to 135.  But because there's a 10 year mandatory minimum, it becomes 120 to 135.  And I believe that 10 year mandatory minimum is appropriate in this case.  I believe that the government concurs with the 10 year sentence as being appropriate in this case.  I'm informed that the victim's family was consulted on numerous occasions by the government and they concurred with the 10 year recommendation.  The PSI is clear in that there are no reasons to depart from the guidelines.  Ten years satisfies 3553(a) and the purposes of 3553(a).  And the sentence of

1    10 years we believe is appropriate for the purpose of

2    punishment and the purpose of acting as a deterrent to

3    others and at the same time is a sentence that was

4    envisioned by the people that wrote the guidelines for

5    conduct of this sort.  And I would respectfully move the

6    Court to enter the 10 year sentence and such other

7    punishments in terms of fines and treatment, et cetera, as

8    the Court feels appropriate.

9              THE COURT:  All right.  Mr. Perez?

10             MR. SEIDEN:  There's one thing I'd like to add,

11   Your Honor.  I'm sorry to interrupt, but we are prepared to

12   make the restitution.  We have a cashier's check to the

13   clerk's office today for the 41,600 for the psychological

14   treatment payable to the Clerk of the Court.

15             THE COURT:  All right.

16             MR. PEREZ:  Your Honor, pursuant to the terms of

17   the plea agreement in this case, the United States

18   recommends the sentence within the applicable advisory

19   guideline range.  Given the application of the guidelines,

20   the guidelines in this case is 108 to 135, but given the

21   fact that the statute requires the position of the

22   mandatory sentence of 120 months, the United States

23   recommends a sentence of 120 months in this case.

24             THE COURT:  Will you come back up.

25             MR. SEIDEN:  Yes, Your Honor.

THE COURT:  The Court has asked the defendant why judgment should not now be pronounced.  After hearing the defendant's response, the Court has found no cause to the contrary.  The parties have made statements on their behalf.  The Court has reviewed the presentence report and the advisory guidelines.

Pursuant to Title 18, United States Code, Sections 3551 and 3553, it is the judgment of the Court that the defendant, Eric Albert Seiden, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 135 months.

Upon release from imprisonment you shall be placed on supervised release for a term of 20 years.

The mandatory drug testing requirements of the Violent Crime Control Act are waived.  However, the Court orders you to submit to random drug testing not to exceed 104 tests per year.

While on supervised release you shall comply with the standard conditions adopted by the Court in the Middle District of Florida.

In addition, you shall participate in a mental health program specializing in sexual offender treatment and submit to polygraph testing for treatment and monitoring purposes.  You shall follow the probation officer's instructions regarding the implementation of this Court

1    directive.

2        Further, you shall contribute to the cost of such

3    treatment and/or polygraphs not to exceed an amount

4    determined reasonable by the probation officer based on

5    ability to pay or availability of third-party payment and

6    in conformance with the probation office's sliding scale

7    for treatment services.

8        You shall register with the state sexual offender

9    registration agencies in any state where you reside, visit,

10   are employed, carry on vocation or are a student as

11   directed by the probation officer.

12       The probation officer shall provide state officials

13   with all information required under Florida Sexual Predator

14   and Sexual Offender Notification and Registration Statutes

15   and/or the Sexual Offender Registration and Notification

16   Act, Title I of the Adam Walsh Child Protection and Safety

17   Act of 2006, and may direct you to report to these agencies

18   personally for required additional processing such as

19   photographing, fingerprinting and DNA collection.

20       You shall have no direct contact with minors under the

21   age of 18 without the written approval of the probation

22   officer, and shall refrain from entering into any area

23   where children frequently congregate including schools, day

24   care centers, theme parks, playgrounds, et cetera.

25       You are prohibited from possessing, subscribing to or

viewing any video, magazines or literature depicting children in the nude and/or in sexually explicit positions.

You shall not possess or use a computer with access to any online service at any location including employment without written approval from the probation officer. This includes access through any Internet service provider, bulletin board system or any public or private computer network system.

You shall permit routine inspection of your computer system, hard drive and other media storage materials to confirm adherence to this condition. This inspection shall be no more intrusive than is necessary to ensure compliance with this condition.

You shall inform your employer or third-party who may be impacted by this condition of this computer-related restriction and the computer inspection provision of this condition.

You shall submit to a search of your person, residence, place of business, any storage units under your control, computer or vehicle conducted by the probation officer at a reasonable time and in a reasonable manner based upon reasonable suspicion of contraband or evidence of a violation of a condition of release.

Failure to submit to a search may be grounds for revocation.

1   You shall inform any residents that the premises may be

2   such to a search pursuant to this condition.

3   You shall cooperate in the collection of DNA as

4   directed by the probation office.

5   It is further ordered that you shall pay to the United

6   States a fine of $250,000.

7   You are hereby ordered to immediately pay this

8   obligation in full.

9   It is further ordered you shall pay to the United

10  States a special assessment of $100 which shall be due

11  immediately.

12  The mandatory restitution provision of 18 U.S.C.

13  section 3663 A apply in this case.

14  It is ordered that you shall make restitution in the

15  amount of 41,600 to the victim's parents.  Restitution is

16  payable to the Clerk, United States District Court.

17  You're hereby ordered to immediately pay this

18  obligation in full.

19  Further, you shall forfeit to the United States any

20  assets previously identified in the plea agreement that are

21  subject to forfeiture.

22  After considering the advisory sentencing guidelines,

23  the minimum mandatory sentence required by statute, and all

24  the factors identified in Title 18, United States Code,

25  Sections 3553(a)(1) through (7), the Court finds that the

1    sentence imposed is sufficient but not greater than

2    necessary to comply with the statutory purposes of

3    sentencing.

4        The Court feels that the seriousness of this offense

5    justifies a high end of the guideline range, and based upon

6    the ability to pay, the Court believes that the maximum

7    fine is appropriate in this case.

8        The Court feels that -- I agree with the victim's

9    parents that it's important in these cases to send a

10   message to others.  Perhaps with the proper deterrence we

11   won't have first time offenders in this case that cause

12   serious problems to the victims who have been victimized

13   whether it's your first time or your tenth time.

14       The Court also recognizes the opinion of Dr. Haber that

15   you're a low risk for recidivism.  The Court, however,

16   feels that the seriousness of this offense does, and the

17   fact that a conviction on count two would bring a guideline

18   range of 235 to 293 months, the high end of the guideline

19   is appropriate.

20       The Court has accepted the plea agreement because it is

21   satisfied that the agreement reflects the seriousness of

22   the actual offense behavior, that accepting the plea

23   agreement will not undermine the statutory purposes of

24   sentencing.

25       In accordance with the plea agreement, it is ordered

that counts one and two of the indictment be dismissed.

You are hereby remanded to the custody of the United States Marshal to await designation by the Bureau of Prisons.

The Court having pronounced sentence, does counsel for the defendant or government have any objections to the sentence or to the manner in which the Court has pronounced sentence?

MR. PEREZ:  No, Your Honor.

MR. SEIDEN:  No, Your Honor.

But we do have two requests.

THE COURT:  All right.

MR. SEIDEN:  One, Your Honor, we would respectfully request the Court recommend FCI Miami if available as a place of incarceration.

Secondly, we're prepared to pay the 41,600 today.  I request a ten day stay on the $250,000.

THE COURT:  Okay.  The Court will grant you the ten day stay on the payment of the fine.

And the Court requests the Bureau of Prisons to place Mr. Seiden at FCI Miami.

Mr. Seiden, to the extent permitted by your plea agreement, you're now advised that it is your right to appeal from the judgment and sentence within 14 days from today's date or from the date the judgment is recorded,

1  whichever is later.  Failure to appeal within the 14 day

2  period is a waiver of your right to appeal.

3      The government may file an appeal from this sentence.

4      You're also advised that you are entitled to assistance

5  of counsel in taking an appeal.  If you're unable to afford

6  a lawyer, one will be provided for you.

7      Is there anything further?

8          MR. SEIDEN:  Not from defense, Your Honor.

9          MR. PEREZ:  No, Your Honor.  Thank you.

10            (sentencing concluded at 2:32 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2          I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6    s\Sandra K. Tremel   November 23, 2010

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25